IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIA LEE,<br><br>     Petitioner,<br><br>  vs.<br><br>RON RACKLEY, Warden, Folsom State<br>Prison,[1]<br><br>     Respondent. | No. 2:12-cv-02052-JKS<br><br>MEMORANDUM DECISION |

Dia Lee, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus

with this Court pursuant to 28 U.S.C. § 2254.  Lee is in the custody of the California Department

of Corrections and Rehabilitation and incarcerated at Folsom State Prison.  Respondent has

answered, and Lee has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On September 12, 2006, Lee, along with Gerald Vang, Nou Vang, and That Xiong, was

charged with the attempted murder of Chong Vang and discharging a firearm at an occupied

motor vehicle.  Attached to both charges and as to all defendants was the special allegation that

the offense was committed for the benefit of a criminal street gang.  The information further

alleged that each defendant was a principal in the attempted murder and that, in commission of

that offense, a principal intentionally and personally discharged a firearm causing great bodily

injury.

---

[1] Ron Rackley, Warden, Folsom State Prison, is substituted for Ronald E. Barnes,
former Warden, High Desert State Prison.  FED. R. CIV. P. 25(c).

On February 14, 2008, Lee and his co-defendants proceeded to trial.  During jury selection, Nou Vang raised a *Batson/Wheeler*[2] objection that was joined by the other defendants. The court denied the motion.

On direct appeal of their conviction, the Court of Appeal recounted the following facts underlying the trial:

### The Prosecution's Theory of the Case

The prosecution's theory was that, on September 8, 2006 (further undesignated calendar references are to that year), the four defendants, members of the South Sacramento Junior Criminal Crips (the JCC) criminal street gang, shot Chong Vang (Chong V.), a member of the rival Masters of Destruction (the MOD) gang, in retaliation for his having shot at three other JCC members on August 31.

### Events of September 8 Prior to the Shooting

To prevent retaliation stemming from the August 31 shooting that targeted the JCC, gang detectives Jeffrey Beezley and Binh Vu, on September 8, around 5:20 p.m., went to Susan B. Anthony Park (the Park), a known hangout of the JCC, to contact JCC members.

At the Park, the two detectives spoke with and searched the four defendants, who were together, but found no weapons, contraband or bandannas.  The detectives noticed, however, a red Honda Civic in the parking lot, which resembled defendant Nou V.'s car. The officers did not search the car.

### Witnesses of the September 8 Shooting

Four such witnesses testified.

M.C., who is defendant Dia L.'s cousin, was playing basketball at the Park in the late afternoon of September 8.  He saw the four defendants there along with other JCC gang members.

While at the Park, M.C. saw a white Honda CRX drive slowly down Detroit Boulevard bordering the Park, and heard loud hip-hop music blaring from the car.  The driver and the group of JCC gang members stared at one another.

---

[2]     *Batson v. Kentucky*, 476 U.S. 79 (1986) (a shorthand reference to the procedure under which a prosecutor's peremptory strikes of potential jurors are challenged on the basis that the strikes are being made on a discriminatory basis, i.e., because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds); *People v. Wheeler*, 583 P.2d 748 (Cal. 1978) (the California counterpart to *Batson*).

When the white CRX turned onto Ann Arbor Way, a dead-end street, M.C. saw the JCC members, including the four defendants, run toward Detroit Boulevard.  With his friends, M.C. walked quickly the other way.

M.C. then saw defendant Gerald V., carrying a black handgun, run to the corner of Detroit and Ann Arbor (M.C. told the police he merely assumed that defendant Gerald V. had a gun).  Gerald V. hid behind a bush; he was adorned with a blue or white bandanna below his eyes, cowboy style.

M.C. also saw defendant That X., carrying a black-gripped handgun and wearing a red bandanna, run toward Detroit Boulevard.

M.C. had also seen defendants Nou V. and Dia L. run toward the red Honda in the parking lot.  Shortly thereafter, he noticed the red Honda parked at the intersection of Detroit and Shraeder/Fallis Circle, a block from Detroit and Ann Arbor (and about 300 feet away from his vantage point).  M.C. saw defendants Nou V. and Dia L. exit the red Honda, with Dia L., and possibly Nou V., holding a gun.  Although he did not see the shooting, M.C. heard about 10 gunshots from at least two guns.

A second witness, J.L., saw the white Honda CRX drive from Ann Arbor onto Detroit, and heard, seconds later, the CRX's blaring music abruptly end, followed by six or seven gunshots.  J.L. did not see the shooters, but his testimony, combined with a statement he made to Detective Vu, echoed much of M.C.'s testimony about the route the white CRX took by the Park while "gangster rap" MOD-lyric music blared from the car, the "gangster stare" exchange between the driver and the men in the Park, and the red Honda's involvement in the shooting, which, J.L. reported, was driven by defendant Nou V.

A third witness, T.T., saw a man, wearing a white bandanna over his nose and mouth, shooting a black handgun at a white Honda CRX at the intersection of Detroit and Fallis/Shraeder Circle.  A second man, taller than the shooter, was standing across the intersection. T.T. heard at least 10 rapidly fired shots.  The CRX sped off, and the shooter ran across the street to the second man.

The fourth witness, R.A., was watching television when he heard three to four gunshots come from the direction of Detroit and Shraeder Circle.  He looked out his window and saw two young Asian men running down Shraeder away from Detroit.  The shorter of the two was wearing a white bandanna over his nose and mouth and carrying a chrome-plated, nine-millimeter handgun (R.A. identified a photograph of the gun at trial). The taller man had a red bandanna over his nose and mouth.  The two men ran to a nearby vacant ("hub") house, where they left the gun, their bandannas, and their sweatshirts. Although R.A. contacted the police, the two men returned and retrieved the discarded items before the police could apprehend them; then off the two went as passengers in a red Honda Civic (J.L. noted that defendant Nou V.'s red Honda Civic looked like the car he saw that day).

Two of these witnesses, M.C. and J.L., were later threatened by JCC members; this evidence was admitted, as the jury was instructed, solely for its effect, if any, on the credibility of these witnesses.

3

### Police Investigation

Evidence showed that Chong V. was the driver of the white CRX and had been shot in the upper left back.

Broken glass and six expended shell casings were found at the scene of the shooting.

A search of Chong V.'s white CRX revealed several bullet holes to its rear exterior, and, inside, broken rear window glass and two different expended bullets.

Defendants Gerald V., Dia L. and That X. tested positive for gunshot residue on their hands.  Although Detective Beezley requested a gunshot residue test on Chong V., that test was never performed.

The four defendants were arrested following police surveillance of an apartment on Nedra Court where one S.V. resided, among others.  (During the early afternoon of September 8, S.V. had seen defendants That X. and Dia L., along with S.V.'s brother and another individual, pass around two black handguns at this apartment.)  Outside a window of this apartment, officers found a silver, nine-millimeter Luger caliber handgun, which defendant That X. had tossed there around 7:30 p.m. on the evening of the shooting.  The six shell casings found at the shooting scene and the two expended bullets found in Chong V.'s CRX were not fired from this gun, but all six shell casings were fired from the same gun.

In a subsequent in-field showup, witness J.L. identified defendant Nou V. as the driver of the red Civic used in the shooting.

### Gang Evidence

The lead investigator in this case, gang detective Beezley, also testified as an expert concerning the gang enhancement. . . .

### Defense

The defense centered on mistaken identification and self-defense/defense of others (with Chong V. shooting first).

As for mistaken identification, defense investigators measured M.C.'s vantage points of the incident at between 200 and 300 feet, and noted some visual obstructions. The defense also extensively questioned M.C.'s credibility.

As for self-defense/defense of others, a materials science expert opined that, since there was apparently more broken glass outside Chong V.'s CRX than inside, the bullet that shattered the glass was shot from inside the car; moreover, the defense noted, the bullet damage to the CRX was only to its rear section.  Furthermore, Chong V. did not go to the hospital—which was less than a 10–minute drive from the shooting site—until about an hour after the shooting and only after apparently stopping at a fellow gang member's house; displaying, the defense argued, suspicious behavior (e.g., weapon disposal; story concoction).

*People v. Vang*, No. C060682, 2011 WL 4840950, at *1-3 (Cal. Ct. App. Oct. 13, 2011).

At the conclusion of trial, the jury found the defendants guilty of attempted murder and discharging a firearm at an occupied motor vehicle.  The jury also found true the gang enhancement allegation as well as the allegation that a principal personally and intentionally discharged a firearm during the commission of the attempted murder.  The jury found not true the allegations that a principal personally and intentionally discharged a firearm causing great bodily injury and that a principal personally used a firearm.

Lee moved for a new trial on the basis that the evidence was insufficient under California Penal Code § 186.22 to establish the requisite primary activities or a pattern of criminal gang activity and the verdicts regarding the firearm enhancement allegations were unintelligible.  Lee also requested the court to exercise its discretion under Penal Code § 1385 and strike the gang enhancement as to the discharging a firearm at an occupied vehicle count.  The court denied the motions.

On December 12, 2008, Lee was sentenced to an imprisonment term of 15 years to life. The court imposed an indeterminate sentence of 15 years to life for discharging a firearm at an occupied vehicle.  It imposed, and stayed pursuant to Penal Code § 654, seven years' imprisonment for attempted murder, plus 20 years for the firearm enhancement.  Imposition of the sentence for the gang enhancement was stayed pursuant to Penal Code § 12022.53(e)(2).

Through counsel, Lee appealed his conviction, arguing that: 1) the trial court erroneously denied the *Wheeler/Batson* motion; 2) there was insufficient evidence as a matter of law to prove the gang allegations; 3) the gang expert's impermissible testimony on ultimate issues required reversal; 4) the jury imposed inconsistent verdicts on the firearm use and discharge enhancements; 5) the trial court abused its discretion in denying Lee's motion to dismiss the

gang enhancements; and 6) the existence of cumulative error warranted reversal.  He also joined

in the arguments of his co-defendants that raised issues relevant to him.  The California Court of

Appeal affirmed the judgment against Lee in a reasoned, unpublished opinion issued on October

13, 2011.  *Vang*, 2011 WL 4840950, at *17.  Lee's counsel also sought review in the California

Supreme Court, raising the same issues raised before the Court of Appeal.  On February 15,

2012, the Supreme Court summarily denied review.

Lee timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on July 22,

2012.

## II. GROUNDS/CLAIMS

In his *pro se* Petition, Lee raises the same arguments he unsuccessfully raised before the

state courts on direct appeal, namely that: 1) the trial court erred in denying the *Batson/Wheeler*

motion; 2) insufficient evidence supports the gang allegations; 3) the gang expert impermissibly

testified on an ultimate issue in the case; 4) the jury's inconsistent verdicts on the firearm use

and discharge enhancements warranted reversal; 5) the trial court abused its discretion in failing

to strike the gang enhancements; and 6) the existence of cumulative error requires reversal.  He

also raises the claims he joined on direct appeal of his conviction, including claims that he was

denied the right to a fair and impartial jury and the trial court erred in denying the defendants'

motion in limine to have the jury view the scene of the shooting.

III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned

decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's

findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear

and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003).

Lee has not replied to Respondent's answer.  The relevant statute provides that "[t]he

allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a

habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the

judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v.*

*Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence

offered to contradict the allegations of the return, the court must accept those allegations as true.

*See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

A.      *Batson/Wheeler Motion* (Claim 1)

Lee first argues that the prosecution impermissibly used a peremptory challenge to

excuse from the jury pool Prospective Juror No. 3063856, an African-American woman.

The Equal Protection Clause prohibits purposeful racial discrimination in the selection of

the jury.  *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).  In *Batson*, the Supreme Court outlined a

three-step process for evaluating claims that a prosecutor has used peremptory challenges in a

manner violating the Equal Protection Clause: 1) a defendant raising a *Batson* claim must

establish a *prima facie* case of discrimination; 2) once a *prima facie* case of discrimination is

established, the burden of offering race-neutral reasons for the strikes shifts to the prosecutor;

3) after the prosecutor offers race-neutral reasons, the trial court has the duty to determine if the

defendant has established purposeful discrimination.  *Paulino v. Harrison*, 542 F.3d 692, 699

(9th Cir. 2008) (citing *Batson*, 476 U.S. at 98).

In this case, the trial court found that the defendants had satisfied the first step by showing a prima facie case of discrimination. *Vang*, 2011 WL 4840950, at *10. It nonetheless concluded that the prosecutor's statement that he struck the juror because she had served on two prior juries that failed to reach a verdict was a genuine, race-neutral justification for the challenge and subsequently denied the motion. *Id.*

On direct appeal, Lee argued that the prosecutor's proffered reasons for striking the juror were neither reasonable or genuine in light of 1) her voir dire and record; 2) the prosecutor's failure to question her more extensively about her prior jury service; and 3) the prosecutor's failure to challenge other similarly situated, non-African-American prospective jurors. *Id.* The Court of Appeal rejected those arguments. *Id.* at *10-11. It concluded that substantial evidence supported the trial court's factual finding that the prosecutor's race-neutral reason was genuine, relying on case law from the California Supreme Court noting that it is reasonable to peremptorily challenge a prospective juror because he or she has served previously on a hung jury. *Id.* at *10 (citing *People v. Farnam*, 47 P.3d 988, 1012 (Cal. 2002)). It also reasoned that the juror was "fairly insistent in voir dire" as to her previous jury service and thus "the prosecutor was not required to harangue Juror No. 3063856 to show his bona fides." *Id.* Finally, it rejected the defendants' comparative juror analysis claim because the unchallenged jurors identified by defendants, one of whom may have served on a hung jury and the other of whom served on a hung jury, were not similarly situated to Juror No. 3063856 because they had not served on two hung juries. *Id.* at *11.

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" regarding *Batson* claims that "demands that state-court decisions be given

the benefit of the doubt." *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).   Under the AEDPA, a federal habeas court may only grant relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338 (2006).  This "standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that the trial court's credibility determination was supported by substantial evidence, we must uphold it." *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012).

In this case, the record indicates that Lee is Asian and thus a different race than the challenged juror.  The Supreme Court has held that criminal defendants may object to race-based peremptory challenges of jurors regardless of whether the defendant and the excluded juror are of the same race.  *Powers v. Ohio*, 499 U.S. 400, 415-16 (1991).  In so doing, however, the Court noted that it may be difficult to make a *prima facie* showing when the potential juror and the defendant are of different races.  *Id.* at 416.  The parties do not dispute, however, the state court's conclusion at step one of the *Batson* analysis that Lee established a *prima facie* case.  Nor do they dispute that the prosecutor produced a race-neutral explanation.  The issue presented in Lee's Petition is therefore whether the state court's determination at step three, that the prosecutor did not engage in purposeful discrimination, was an unreasonable determination pursuant to 28 U.S.C. § 2254(d)(2) of the facts in light of the evidence presented in the state court proceedings.

Under the circumstances of this case, the Court concludes that it was not.  The trial judge questioned the prosecutor before concluding that his explanations were not pretextual, a finding which is "entitled to appropriate deference." *Cook v. LaMarque*, 593 F.3d 810, 815 (9th Cir.

2010) (affording deference to the trial court's factual findings upon consideration of the prosecutor's proffered reasons).  This finding fully comports with federal law holding that a juror's past service on a hung jury is a legitimate race-neutral reason for exercising a peremptory strike, *Ngo v. Giurbino*, 651 F.3d 1112, 1116 (9th Cir. 2011); *United States v. Mixon*, 977 F.2d 921, 923 (5th Cir. 1992); *United States v. Rudas*, 905 F.2d 38, 41 (2d Cir. 1990), as is the fear that a juror would be unable to deliberate to a verdict, *see United States v. Changco*, 1 F.3d 837, 840 (9th Cir. 1993) (an "inability to relate to other jurors" is a valid, race-neutral reason for excluding a prospective juror); *United States v. Daly*, 974 F.2d 1215, 1219 (9th Cir. 1992) (per curiam) (dismissal of a prospective juror because he "appeared to be a loner" who could "hamper the jury's ability to reach a unanimous verdict" constituted a plausible, neutral reason for the dismissal).

Recently, the Ninth Circuit granted habeas relief on a petitioner's *Batson* challenge to a prosecutor's removal of a Hispanic juror.  *Castellanos v. Small*, ___ F.3d ___, 2014 WL 4413439, at *9-10 (9th Cir. Sept. 9, 2014).  In *Castellanos*, the prosecutor's proffered reason for challenging the juror was belied by the record, and circumstantial evidence, including a comparison to jurors who were ultimately seated, undermined the prosecutor's credibility.  *Id.* at *8.  The Ninth Circuit concluded that "comparative juror analysis reveals such significant evidence of pretext" that it was required to conclude that the state court's finding was an "unreasonable determination of the facts in light of the evidence presented."  *Id.* at *9.  In the instant case, however, the appellate court on direct review evaluated the voir dire transcript, conducted a comparative juror analysis, and found no inconsistencies.  This Court's review of

the record also reveals no inconsistencies, and thus this case is readily distinguishable from *Castellanos*. Accordingly, Lee cannot prevail on his *Batson/Wheeler* claim.

B.    *Sufficiency of the Gang Enhancement Allegations* (Claim 2)

A "criminal street gang" means "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." CAL. PENAL CODE § 186.22(f). After the jury reached its verdict, Lee moved for a new trial, claiming that the evidence was insufficient under § 186.22 to establish the requisite primary criminal activities or a pattern of criminal gang activity. The court denied the motion. Lee reasserts his insufficiency of the evidence claim in the Petition before this Court.

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical

facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted). It is through this lens that this Court must view an insufficiency of the evidence claim.

The gang enhancement statute enumerates a number of offenses which may be used to establish a "pattern of criminal gang activity." *See* CAL. PENAL CODE § 186.22(f). Those offenses include the commission or attempted commission of assault with a deadly weapon, unlawful homicide, shooting at an occupied vehicle, and burglary. *Id.* In this case, the California Court of Appeal relied the two present offenses of attempted murder and shooting at

13

an occupied vehicle as well the gang expert Beezley's testimony regarding a June 2005 "gun fight" in which JCC members shot at MOD gang members and a January 2005 first-degree burglary for which 2 JCC members were convicted. *Vang*, 2011 WL 4840950, at *7. As the appellate court noted, present offenses may be used to establish the requisite pattern. *Id.* (citing *People v. Sengpadychith*, 27 P.3d 739, 744 (Cal. 2001). Thus, there was sufficient evidence from which a rational factfinder could find that JCC had a "pattern of criminal gang activity." CAL. PENAL CODE § 186.22(f).

The court further relied on Beezley's testimony that one of the gang's primary activities is the commission of one or more of the enumerated crimes, finding it "sufficiently reliable" because it was based upon "his dozens, perhaps hundreds, of contacts with JCC members; his hundreds of gang crime investigations; his review of law enforcement records; and his discussions with his own as well as other law enforcement agencies." *Id.* The appellate court ultimately concluded that, "[c]oupling Detective Beezley's opinion with the trial court's apt observation of '[t]hree significant [enumerated] crimes within the span of 15 months' (the firearm assault in June 2005, the first degree burglary in January 2006, and the present offenses in September 2006), . . . there was sufficient evidence to find that the JCC engaged in one or more enumerated offenses as one of its primary activities." *Id.* at *8. *Sengpadychith* also provides that the prosecution may rely on a properly qualified gang expert's testimony to establish the primary activities element. 27 P.3d at 744. Accordingly, a rational factfinder could also draw the inference that "one of [JCC's] primary activities" was the commission of predicate

14

offenses.  CAL. PENAL CODE § 186.22(f).  Lee is therefore not entitled to relief on his

insufficiency of the evidence claim.[3]

C.     *Expert Testimony on Ultimate Issue* (Claim 3)

Lee next argues that the gang expert's testimony on an ultimate issue caused prejudice to

Lee that was not cured by the trial court's subsequent admonishment.  In considering this claim

on direct appeal, the Court of Appeal laid out the following facts:

> Pursuant to an in limine defense motion, the trial court ruled that the gang expert, Detective Beezley, could not testify to ultimate facts, including any defendant's knowledge and intent in committing the shooting; the key to handling this issue, said the trial court, was to use hypothetical questions.
>
> Nevertheless, the prosecutor at trial questioned Detective Beezley, as a gang expert, as follows:
>
> "Q. Based on what you know about each of these defendants and what you know about the investigation of the [Park] shooting on September 8th, 2006, in your expert opinion was that shooting gang-related activity?
>
> "A. Absolutely, 100 percent. [¶] . . . [¶]
>
> "Q. Can you describe what you mean a little bit more about that?
>
> "A. Absolutely. I think it's a classic retaliation shooting where the opportunity presented itself.  The potential suspect drove through their neighborhood, and I believe he disrespected them in front of their peers and also in front of citizens.

---

[3]      On direct appeal, the defendants also argued that the gang enhancement must be reversed because it was not shown that the underlying offense was committed with the specific intent to assist "other" criminal gang conduct.  *Vang*, 2011 WL 4840950, at *8.  The Ninth Circuit previously held in *Garcia v. Carey*, 395 F.3d 1099 (9th Cir. 2005), and *Briceno v. Scribner*, 555 F.3d 1069 (9th Cir. 2009), that the "gang enhancement can only be applied when the defendant had the specific intent to facilitate gang members' criminal activities *other than* the charged crime."  *Emery v. Clark*, 643 F.3d 1210, 1215 (9th Cir. 2011) (per curiam).  The California Supreme Court explicitly disapproved of that interpretation in *People v. Albillar*, 244 P.3d 1062 (Cal. 2010), and the interpretation is no longer binding in this Circuit.  *See Emery*, 643 F.3d at 1215-16 (recognizing "that the California Supreme Court has overruled *Briceno* and *Garcia's* interpretation of [California Penal Code] section 186.22(b)(1)" and applying "the California Supreme Court's authoritative interpretation of section 186.22").  Thus, "[t]here is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*."  *Albillar*, 244 P.3d at 1075-76 (citations omitted).

[¶] They quickly gathered a plan to retaliate, and they enacted and executed that retaliation shooting on their rival gang member."

Detective Beezley then added: "My personal belief is they knew who the shooter was from the [MOD-instigated August 31] shooting and they recognized him. Coupled with all these other mitigating [sic] factors such as playing the music, the eye stare, those are all signs of disrespect. And I think at that point they formulated a plan for a retaliation shooting."

The trial court found the prosecutor violated the in limine order. After extensive discussion with counsel, the trial court decided to admonish the jury, but declined a defense request to question the jurors individually about whether they could disregard Detective Beezley's improper opinion.

The trial court admonished the jury as follows: "Ladies and gentlemen, you are directed to disregard that portion of Detective Beezley's testimony offered yesterday just before the morning break that referenced his personal belief as to what the defendants knew, recognized, or formulated in response to the presence of Chong [V.] on Detroit Boulevard on September 8th, 2006. It is improper and irrelevant for an expert to state a conclusion on an ultimate issue. [¶] As jurors, you are the ultimate factfinders in this case. Therefore, you are directed not to consider that portion of Detective Beezley's testimony, except as it may demonstrate possible bias on the part of the witness [this last clause was requested by the defense]."

*Vang*, 2011 WL 4840950, at *4.

The appellate court ultimately rejected the claim, finding that the admonition was effective, the trial court did not abuse its discretion in refusing to individually question the jurors, the prosecutor did not commit misconduct, and it was not reasonably probably that the defendants would have fared better had the alleged misconduct not occurred. *Id.* at *5-6.

Lee's claim cannot prevail on federal habeas review either. His claim that the trial court erred in its handling of gang expert testimony on an ultimate issue arises out of state law, which is not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). To implicate Lee's constitutional rights, the testimony must have so fatally infected the proceedings as to render them fundamentally unfair. *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). As the appellate court reasoned, "In the course of a three-month trial, the prosecutor asked two of these improper questions (substantively speaking, not counting follow-up

questions), and substantial evidence supports the trial court's finding that the prosecutor asked them inadvertently." *Vang*, 2011 WL 4840950, at *6. The jury was also instructed to disregard the testimony, which the appellate court reasonably found to be an effective admonition, and the jury is presumed to follow the court's instructions and admonitions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) (the Supreme Court "presumes that jurors, conscious of the gravity of their task, attend closely [to] the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them").

Similarly, Lee's claim that the trial court abused its discretion in refusing to individually question the jurors is not cognizable on habeas review either. Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[4] Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not. *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion

---

[4]    At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error. *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000). This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard. *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc). The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

was 'an unreasonable application of . . . clearly established Federal law.'" (quoting § 2254(d)(1))).

Moreover, there is no United States Supreme Court law establishing that it is erroneous to permit an expert to testify concerning an ultimate issue of fact. *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009). Rather, as the Ninth Circuit has recognized, "[i]t is well-established . . . that expert testimony concerning an ultimate issue is not per se improper." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citation omitted). Although "[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact." *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990) (internal citation omitted); *see also* FED. R. EVID. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). Thus, Lee cannot show that the appellate court's denial of this claim was contrary to or an unreasonable application of clearly established federal law under the AEDPA, and Lee cannot prevail on this claim.

D.    *Inconsistent Verdicts* (Claim 4)

Lee additionally argues that the jury's inconsistent verdicts on the firearm use and discharge enhancements mandates reversal of the 20-year term imposed for the use of a firearm. The jury was instructed with CALCRIM 1402 that, if they found the defendant*s* guilty of attempted murder in Count 1, then they must decide whether a principal in the crime:

1. Personally used a firearm as defined in Instruction 3146;
2. Personally and intentionally discharged a firearm as defined in Instruction 3148; OR
3. Personally and intentionally discharged a firearm causing great bodily injury[.]

18

The jury found not true the use allegations listed in numbers 1 and 3 above, but found true the middle level of intentional discharge of a firearm.  Lee moved for a new trial based on the inconsistent verdicts, arguing that they constituted a violation of due process.  The court denied the motion after conducting an independent review of the evidence and determining that a true finding on the use allegation listed in number 2 was supported by the record.  The Court of Appeal also rejected the claim on direct appeal.  It concluded:

> Arguably, no inconsistency occurred here.  The jury simply found true the most appropriate of section 12022.53 enhancements from the three *disjunctive* options offered.  For a culture steeped in multiple choice offerings and directed to choose the *best* answer, this is the natural outcome.
> In any event, inconsistent findings are generally allowed to stand if they are otherwise supported by substantial evidence, which surely is the case here regarding the finding of intentional firearm discharge by a principal in the offense.

*Vang,* 2011 WL 4840950, at *16 (citations omitted).

The appellate court's holding fully comports with federal law, under which "it is well-established that inconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict." *United States v. Suarez*, 682 F.3d 1214, 1218 (9th Cir. 2012) (citation, internal quotation marks and bracketing omitted).  As that court noted, overwhelming evidence supports the true finding on the firearm enhancement.  Among other evidence, M.C. saw Gerald V. and That X. run across Detroit Boulevard, each carrying a handgun, to hide and wait for Chong Vang to return in his white CRX.  M.C. then saw Nou V. and Lee exit the red Civic, both holding guns.  He then heard gunshots less than a minute after losing sight of Nou V. and Lee.  Another witness saw a man holding a black handgun standing on the corner of Detroit Boulevard and Fallis Circle shooting at a white CRX.  Six expended shell casings and shattered glass were found scattered in

the street.  Gunshot residue tests on the hands of Gerald V., That X., and Lee all came back

positive.  Accordingly, while the jury's not true finding on the personal firearm use enhancement

may be logically inconsistent with the true finding that one of the defendants personally and

intentionally discharged a firearm, that inconsistency is not grounds for habeas review because

substantial evidence supports the verdict.

E.    *Failure to Strike Gang Enhancements* (Claim 5)

   Lee further argues that the trial court abused its discretion in denying the motion under

Penal Code § 1385 to dismiss the gang enhancements.  In considering this claim on direct

appeal, the Court of Appeal noted :

>   Under section 1385, a trial court may strike an enhancement "in the furtherance of
> justice." (§ 1385, subds.(a), (c).)  And section 186.22, subdivision (g) of the gang
> enhancement statute adds, as pertinent: "Notwithstanding any other law, the court may
> strike the additional punishment for the enhancements provided in this section . . .  in an
> unusual case where the interests of justice would best be served . . . ."

*Vang*, 2011 WL 4840950, at *8.

   It subsequently  found no abuse of discretion because "[t]his was not an unusual case

where the interests of justice would best be served by striking the enhancements.  Instead, this

case was an all-too-common one of senseless retaliatory gang violence."  *Id.*

   Lee's claim fares no better on federal habeas review.  As previously discussed with

respect to claim 3, *supra*, a claim that the trial court abused its discretion is not cognizable on

habeas review.  A state court's interpretation of state law, including one announced on direct

appeal of the challenged conviction, binds a federal court sitting in habeas corpus.  *Hicks v.*

*Feiock*, 485 U.S. 624, 629 (1988).  Under *Hicks*, this Court is bound by the state court's rejection

of Lee's claim that the trial court misinterpreted California Penal Code § 1385 in denying his

motion to strike the gang enhancement.  Because Lee's claim is premised on an interpretation of

state law that was rejected by the state courts, it does not warrant federal habeas relief.

F.     *Joinder Claims* (Claim 7)

On direct appeal of his conviction, Lee joined in certain arguments raised by his co-

defendants, which Lee appears to re-assert here.

1.     Juror Bias

The defendants pointed to two statements made by the same juror (one of which occurred

when the juror was an alternate prior to being seated) which they contended constituted

misconduct and evidenced prejudgment of the case.  *Vang*, 2011 WL 4840950, at *11-12.  The

Court of Appeal described the following circumstances underlying the statements:

> On April 1, 2008, during trial, an alternate juror (later seated as Juror No. 5)
> remarked to defense counsel for defendant Dia L., something like: "[T]hey all pled. No,
> that's just [an] April [F]ool's joke, but you might want to think about."  Dia L.'s attorney
> told the trial court that "[i]t was clearly in a light-hearted manner."
> The trial court asked all four defense attorneys if they wished to voir dire the
> alternate juror.  They declined, realizing it was a joke and not wanting to draw attention
> to it.  The trial court did not investigate further.  Proceedings resumed.
> . . . .
> The alternate juror above subsequently took the seat of Juror No. 5.
> Near the end of the prosecution's case-in-chief, while Detective Beezley was
> testifying as a gang expert, Juror No. 5 approached the bailiff during a break and asked,
> "[A]fter the case ends, would the jury . . . get an escort out to the parking [lot]?"
> In light of this question, defense counsel were concerned that Juror No. 5 may
> have prejudged the case.  The trial court echoed this concern and questioned the bailiff
> and Juror No. 5, allowing defense counsel to question as well.
> That inquiry disclosed: (1) Juror No. 5 had sat on a jury some six years before in a
> drug/murder case (no gang allegations) in which certain jurors had been escorted in and
> out of the building because family members and associates of the defendant, who were in
> the courtroom audience, would follow these jurors in their vehicles on their way home
> (this occurred during trial and deliberations); (2) Juror No. 5 had seen nothing of this sort
> in the present trial (although he had watched for such behavior); (3) Juror No. 5 believed
> he could be fair and impartial in the present case; (4) he was not apprehensive about
> being a juror in the present case; and (5) he had not prejudged the present case and was
> still open to all the evidence.

The trial court declined defendants' request to remove Juror No. 5, reasoning in part: "He's not currently expressed fear.  He's not currently asked for an escort.  He's not made any comment that would indicate that his fairness or his ability to remain open to the evidence has been compromised."

*Id.*

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  While "[d]oubts regarding bias must be resolved against the juror," *United States v. Martinez-Martinez*, 369 F.3d 1076, 1082 (9th Cir. 2004) (citation omitted), a defendant "bears the burden of showing that a juror was actually biased against him or her and that the district court abused its discretion or committed manifest error when it failed to excuse the juror for cause," *United States v. Hanley*, 190 F.3d 1017, 1030 (9th Cir. 1999) (internal quotation marks and alteration omitted), *superceded by statute as recognized in United States v. Ortega*, 520 F. App'x 626 (9th Cir. 2013).  "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel."  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

However, Lee fails to demonstrate the existence of juror bias with respect to either of the juror's statements.  As the Court of Appeal recognized as to the first statement when it denied this claim on direct appeal, "[t]he record shows this comment was made in jest, on a day reserved for jest.  Even defense counsel at trial saw no need for a court inquiry.  The trial court acted properly within its discretion in not further investigating the matter."  *Vang*, 2011 WL 4840950, at *11.  As to the second statement:

Substantial evidence showed that the issue of an escort had been a matter of prior jury service for Juror No. 5 rather than a matter of present bias.  Had Juror No. 5 been presently fearful because of his past jury service, he likely would have said so and gotten

22

excused from the present jury service.  Instead, he assured the court and counsel that he had not prejudged the case and was fair, impartial and open to the evidence.  In this respect, what was in the past was of the past.

*Id.* at *12.

Neither of the juror's comments evince actual bias, and the appellate court's conclusions as to both statements are fully supported by the record.  Moreover, a trial judge's finding that a juror was not biased is a factual finding presumed to be correct because "resolution [of the juror impartiality issue] depends heavily on the trial court's appraisal of witness credibility and demeanor."  *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *see, e.g.*, *Wainwright v. Witt*, 469 U.S. 412, 428-29 (1985); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).  This presumption of correctness also applies to implicit factual findings.  *Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990).  Here, Lee's bare assertion that the juror was biased does not meet his burden of adducing clear and convincing evidence sufficient to overcome the presumption of correctness afforded the trial court's finding of impartiality.  *See* 28 U.S.C. § 2254(e)(1).  Accordingly, the state court's rejection of Lee's juror bias claim did not contravene or unreasonably apply federal law, and Lee cannot prevail on this claim.

2.      Jury View

Lee additionally joined in his co-defendants' argument on direct appeal that the trial court erred in denying their motion in limine to have the jury view the scene of the shooting. Section 1119 of the Penal Code provides, "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, . . . it may order the jury to be conducted in a body . . . to the place . . . which must be shown to them by a person appointed by the court for that purpose . . . ."  The defendants argued on direct appeal that

23

the jury's visit to the shooting scene was "essential to evaluate M.C.'s credibility . . . [whose view] was from around 300 feet away and was apparently obstructed by buildings occasionally." *Vang*, 2011 WL 4840950, at *12 (parentheses omitted).  The Court of Appeal disagreed, finding no abuse of discretion and noting that "[t]he trial judge reviewed an array of photographs from the parties depicting the scene, and viewed the scene on his own" and thus properly considered whether there were other means of testing witness credibility.  *Id.*

In California, it is within the discretion of the trial court to grant or deny a request for a jury view.  CAL. PENAL CODE § 1119; *see People v. Price*, 821 P.2d 610, 665 (Cal. 1991).  The record supports the appellate court's conclusion that the trial court properly exercised its discretion in denying the jury view request.  In any event, even if the trial court violated California state law in denying the request, again, habeas relief is not warranted for the claim; there is no constitutional right to a jury view and no authority of the United States Supreme Court requires that, when a defendant challenges an eyewitness's credibility based on obstructions or distance, the jurors be given an opportunity to view the scene directly.  Lee is therefore not warranted to relief on this claim.

G.      *Cumulative Error* (Claim 6)

Lee finally argues that he "was prejudiced by the accumulation of errors throughout the proceedings," citing the claims raised in his Petition as support.

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).  Such "infection"

occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294.

As discussed above, however, Lee does not allege any claims that amount to errors of constitutional dimension. Accordingly, he demonstrates no errors that can accumulate to a level of a constitutional violation, and the state courts therefore did not unreasonably deny him relief on this claim. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

V. CONCLUSION AND ORDER

Lee is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: September 16, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge
